The **TRAVELERS INDEMNITY COMPANY**

v.

**WEST GEORGIA NATIONAL BANK** and **Housing Authority of the City of Carrollton.**

**Civ. A. No. 991.**

United States District Court,
N. D. Georgia,
Newnan Division.

Sept. 16, 1974.

---

London, Yancey, Clark & Allen, Birmingham, Ala., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

Henry C. Head, Wiggins & Camp, Carrollton, Ga., for defendants.

## ORDER

ALBERT J. HENDERSON, Jr., District Judge.

This is a diversity action for a declaratory judgment to determine the respective rights of the parties to certain monies and property. The plaintiff, Travelers Indemnity Company (hereinafter referred to as "Travelers"), as surety of General Constructors, Inc. (hereinafter referred to as "General") brought this suit against the West Georgia National Bank (hereinafter referred to as the "bank") which managed General's accounts on a construction project for the Housing Authority of the City of Carrollton, Carroll County, Georgia (hereinafter referred to as "Authority"), also a defendant. The bank answered and filed a counterclaim against Travelers, as General's surety, to recover $8,964.02 plus cost which allegedly represents a portion of an unpaid loan to General for labor and materials.

The case came on for trial before the court without a jury and at the conclusion thereof, the parties were directed to submit written arguments and briefs. They have complied with that direction and the case is ready for decision.

General contracted with the Authority on January 23, 1970, for construction of a low rental housing project. In connection with that contract, Travelers, which in 1962 entered into an agreement of indemnity with General, issued a performance and payment bond on this project in the amount of $973,826.00. Thereafter, General opened an account with the bank and made arrangements for the extension of unsecured loans, the last being for $30,000.00 in March of 1971. During April of 1970, in accordance with its loan agreement with the bank, General authorized the Authority to deposit all progress payments from the project directly into its account at the bank.

On April 23, 1971, the bank received a check for $21,197.86 dated April 22, 1971, and credited General's account with that sum. At the same time, however, construction on the Authority's project halted because of General's financial inability to complete the job. By this time, all the parties were aware of General's lack of funds and the resulting work stoppage. A formal notice of default was sent to the Authority on April 22, 1971 and shortly thereafter Travelers financed the completion of the construction.

In order to recover part of its outstanding loan of $30,000.00 the bank, on April 23, 1971, "set off" the deposit against General's past due note. This set off left a deficiency remaining on the note and the bank attached certain items of equipment found at the job site. A judgment against General was obtained by the bank in the State Court of Carroll County for the unpaid balance of $8,904.02 and a fi fa issued. Thereafter, three pieces of equipment were sold for $11,000.00 and that sum placed in the registry of the court on May 29, 1973.

The issues pending for determination are:

(1)(a) Is the surety, Travelers, entitled to recover from the defendant bank the sum of $21,197.86, representing the amount of the progress payment it received on April 23, 1971, after General's formal notice of default to the Authority?

(b) If not, can the surety recover this amount from the Authority?

(2)(a) Is the plaintiff entitled to recover from the Authority the remaining portion of the contract price less the amount withheld for uncompleted and unsatisfactory work?

(b) To what extent, if any, are liquidated damages to be deducted from the balance due on the contract in favor of the Authority?

(3)(a) Can the bank recover from the surety the full amount of its March, 1971 loan to General?

(b) Is the bank entitled to recover from the surety the sum of $8,964.02 plus costs representing the remaining

balance due on the monies advanced to General in March, 1971?

(4) Which party, the plaintiff or the defendant bank, is entitled to the proceeds of the sale of the attached equipment presently in the registry of the court?

The leading case in this circuit on the right of recovery of progress payments as between the defaulting contractor's surety and an assignee bank is Fidelity & Deposit Co. of Maryland v. Scott Brothers Construction Co., 461 F.2d 640 (5th Cir. 1972) which follows the reasoning of American Fire & Casualty Co. v. First Nat'l Bank of New York, 411 F.2d 755 (1st Cir. 1969) and National Shawmut Bank of Boston v. New Amsterdam Casualty Co., 411 F.2d 843 (1st Cir. 1969). In *Scott Brothers*, 461 F.2d at 642, the court expounded the following rule:

> The District Court, in resolving the issue, correctly perceived and followed the distinction between, on the one hand, *retainages and earned but unpaid progress payments* and, on the other hand, progress payments that already have been paid before the contractor defaults. As to the former category of contract funds a surety enjoys a claim superior to that of an assignee bank, whereas the bank's rights take priority of the surety's as to contract payments made before default. See National Shawmut Bank of Boston v. New Amsterdam Cas. Co., 411 F.2d 843, 848 (1st Cir. 1969); Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967). . . .
>
> The distinction reflects the theory that a surety "is not only a subrogee of the contractor, . . . but also a subrogee of the [owner] and entitled to any rights the [owner] has to the retained funds." Trinity Universal, supra, 382 F.2d at 320. "But for the surety's completion of the work, the obligee on the bond, be he owner or prime contractor, would have been entitled to apply the funds against the cost of completion. It is the surety's

performance which frees the funds, and, . . . the surety is entitled to them." American Fire & Cas. Co. v. First National City Bank of N. Y., 411 F.2d 755, 758 (1st Cir. 1969). . . . Any payments made by the owner prior to default, however, are attributable to the contractor's performance, not the surety's, and the owner, to whom the surety becomes subrogated, may not rightfully withhold such payments so long as the contractor is in material compliance with its obligations under the contract. American Cas. Co. of Reading, Pa. v. Line Materials Indus., 332 F.2d 393, 395 (10th Cir. 1964).

This principle of recovery was emphasized in *National Shawmut Bank of Boston, supra*, 411 F.2d at 848:

> Here the payments were earned but unpaid prior to the contractor's default. Prior to default, the contractor had the right to assign progress payments and had the Bank received payment, it could not (absent circumstances amounting to fraud) have been divested by the surety. But upon default, the surety which is obligated to complete the work steps into the shoes of the [obligee on the bond] —not of the contractor which on default has forfeited its rights. It is subrogated not only to the right of the [obligee] to pay laborers and materialmen from funds retained out of progress payments, Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896); Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547 (1908); Pearlman v. Reliance Ins. Co. [371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190], supra, but also to the [obligee's] right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default. United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); Trinity Universal Ins. Co. v. United States, 382 F.2d 317, 320 (5th Cir. 1967).

■ Therefore, because the bank did not have a secured interest in the assignment of the contract proceeds, the determining factor in the battle for the progress payment of April 23, 1971 is whether General was in default on the construction contract prior to the payment. In that connection, the precise time of default depends on the facts of each case, not the formal declaration or notification of the default. In Royal Indemnity Co. v. United States, 371 F.2d 462, 464, 178 Ct.Cl. 46 (1967) the court stated:

> Bank also argues that there must be some sort of formal declaration of Contractor's default before the superior rights of the surety arise. That contention is not supported by the case law. All that is necessary for the surety to prevail is that the contractor be in default as a *matter of fact*; and that as a result of such default, the surety has become obligated to pay under its Miller Act payment or *performance bond*. No formal declaration of default is required. See Prairie State National Bank of Chicago v. United States [164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896)] . . . . (emphasis added).

This conclusion was adopted in *Scott Brothers, supra,* 461 F.2d at 643, where it was noted:

> [t]hat [the surety] had no obligation to begin performance under its bond with [the contractor] and thus no rights to contract payments as subrogee, until [the contractor] either stated that it could no longer continue on the job or until [the contractor] *materially failed* in its performance. (emphasis added).

The evidence reveals that during the months of March and April, 1971, the activity at the Carrollton job site was plagued with work stoppages of subcontractors because of General's inability to pay its bills. Indeed, the financial stability of the contractor was questioned by the bank at the first of April, 1971. On April 13, 1971 Travelers was informed by General that it could no longer continue to operate without financial assistance and it only had funds sufficient to meet the payroll for that week. On April 15, 1971, representatives of Travelers and General met to discuss the situation and to analyze General's condition to determine the specific course of action to be followed. Finally, formal notification of default was relayed to the Authority by letter of April 22, 1971. Prior to that time, however, the Authority was aware and concerned over General's inability to satisfy its creditors, the unpaid subcontractors and decreases and halts in work at the job site.

■ Thus, when the disputed progress payment was made on April 22, 1971 and received by the bank on April 23, 1971 there is no question that General, as a matter of fact, was in default on its contract with the Authority. Additionally, the defendants were aware of this change in circumstances. Upon the happening of this event, the completing surety became entitled to the *earned but yet unpaid* progress payment of April 23, 1971.

■ The defendant Authority does not appear to question the right of the plaintiff to a portion of the unpaid balance due on the contract. A surety who completes a contract for its principal has an equitable right thereto. Pearlman v. Reliance Insurance Co., 371 U.S. 132, 138, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); American Fire & Casualty Co. v. First National Bank of New York, *supra,* 411 F.2d at 758; National Shawmut Bank of Boston v. New Amsterdam Casualty Co., *supra,* 411 F.2d at 848; Trinity Universal Insurance Co. v. United States, *supra,* 382 F.2d at 320. As noted in American Fire & Casualty, *supra,* 411 F.2d at 758, "[b]y its nature retainage is a security for protection against failure of completion." Since Travelers completed the contract, it is entitled to the retained fund of $44,890.53 less, of course, the amount for unsatisfactory and uncompleted work which, in the present case, is agreed to be $3,613.18, and liquidated damages, if applicable.

While the plaintiff is entitled at most to $41,277.35, its recoverable amount is contingent upon the validity of the Authority's liquidated damages claim of $9,531.00. The building contract between General and the Authority contains a provision for such damages as follows:

### 3. LIQUIDATED DAMAGES

a. As actual damages for any delay in completion are impossible of determination the Contractor and his sureties shall be liable for and shall pay to the Local Authority the sums hereinafter stipulated as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted:

(1) $1.50 per dwelling unit per calendar day applicable to all work.
. . .

(b) The Local Authority may accept any part of the work if there has been such a degree of completion as will, in its opinion, make such part reasonably safe, fit, and convenient for the use and accommodation for which it was intended.

Plaintiff's Exhibit No. 14.

The Authority requested twenty-one construction changes, more commonly referred to as "change orders", causing an additional expenditure of approximately $45,000.00 over a period of several working days beyond the term of the contract. Because of these change orders, the director of the Authority entered into an oral agreement allowing General extensions of the completion time under Section 13 of the contract to obviate liquidated damages. The same official did seek and was granted approval of the Department of Housing and Urban Development (hereinafter referred to as "HUD") for an extension at least in one instance. Other such requests were made by General, received by the Authority but were not submitted to HUD for its approval. On occasions when extensions were sought, the Authority director merely noted they would be deferred for future action. In spite of these failures on the part of the housing authority, it now contends liquidated damages should be assessed against General under the provisions of the contract. In support of this assertion, it merely points out that General was delayed in completing its contract, a fact the plaintiff acknowledges, and that the applications for change order extensions were never approved by HUD.

■ Under such circumstances, the application of the equitable principle of estoppel is appropriate here. The testimony establishes that had the change orders not been requested the contract would have been completed on time. Prior to each change order, the contractor sought time extensions and, pursuant to a general agreement, and in some cases, specific agreements, that the period for completion would be increased and no liquidated damages assessed, General made the requested alterations.

■ When the conduct of one party prevents the execution of the exact terms of the contract, he may not then complain of the non-compliance of the other party.

> Where a defendant prevents the performance of a stipulation of a contract undertaken by the plaintiff, he is estopped from setting up in his own behalf any injury which may have resulted from the nonperformance of such condition.

Allied Enterprises, Inc. v. Brooks, 93 Ga.App. 832, 834, 93 S.E.2d 392, 398 (1956), citing Stimpson Computing Scale Co. v. Taylor, 4 Ga.App. 567, 61 S.E. 1131 (1908); Byck v. Weiler Co., 3 Ga.App. 387, 59 S.E. 1126 (1908); Corbin, Contracts, 1 Vol.Ed. (1969) §. 947 at 928, 929.

For these reasons, the Authority is now estopped from claiming liquidated damages.

The December 21, 1962 indemnity agreement between General and Travelers and the bond covering this contract (Plaintiff's Exhibit No. 6) provides that in the event of a default by the indemnitor, all the machinery and equipment lo-

cated at the construction site is assigned and transferred to the plaintiff. Thus, upon General's default prior to April 23, 1971, its equipment, including that attached by the bank, became the property of Travelers and the subsequent state court attachment was ineffective as against the plaintiff's title. Travelers was not a party to the attachment proceedings.

■ The rights of a prior assignee are greater than those of a subsequent creditor claiming under an attachment or a judgment. This proposition is supported in Walton v. Horkan, 112 Ga. 814, 816–817, 38 S.E. 105, 106 (1900):

Was the equitable assignment entitled to priority over the garnishment? The following from 14 Am. & Eng. Enc.L. (2d ed.) 857–859, furnishes an apt answer: "As a general rule the plaintiff in garnishment proceedings stands in no better position than the defendant does with respect to the indebtedness sought to be reached by the process of garnishment, and the process of garnishment will not hold anything which is not legally and equitably the property of the principal defendant; and therefore it is universally held that an assignment by the defendant of the claim due to him, irrespectively of whether the assignment is equitable or legal, will take precedence of a subsequent writ of garnishment served upon the debtor at the suit of creditors of the assignor, provided the assignment was in good faith and for a valuable consideration. . . . The rule that a prior assignment will take precedence of a subsequent garnishment served on the debtor at the suit of creditors of the assignor applies with equal force where the chose in action is assigned as security, as if the assignment were absolute, and the assignor had parted with all his interest, both legal and equitable in the thing assigned." Indeed, it is not, as between assignor and assignee, essential to the validity of the assignment that notice thereof should be given to the person from whom the debt is owing; and even in the absence of such notice, the garnishing creditor will be postponed to the assignee, when the garnishment was served subsequently to the making of the assignment. See page 861 of the volume last cited, and also 2 Am. & Eng.Enc.L. (2d ed.) 1076; Rood on Garnishment, § 66 et seq.; 2 Shinn, Att. & Gar. § 614, p. 1014; Waples, Att. & Gar. (2d ed.) § 264.

Suttles v. Vickery, 179 Ga. 751, 758, 177 S.E. 714 (1934); cf. Gray v. Travelers Indemnity Co., 280 F.2d 549, 551–552 (9th Cir. 1960).

■ Accordingly, Travelers is entitled to the $11,000.00 proceeds of the sale of the equipment.

There remains a question of whether the surety is liable to the bank for either the entire sum of the unsecured loan of $30,000.00 made to General in March, 1971 or the amount of the judgment for $8,964.02 sought in the bank's counterclaim.

■■ There is no question that the loans made to General were unsecured extensions of credit. (T. 182–183, 184). Likewise, it is clear that no coverage is afforded under the performance and payment bond made in favor of the Authority for the unsecured debts to the bank. The terms of the payment bond restrict those covered thereby to "all persons doing work or furnishing skill, tools, machinery, supplies or materials under or for the purpose of the contract." (Plaintiff's Exhibit No. 8). The bank does not fall in that category.

Ga.Code Ann. § 103–103, provides:

The contract of suretyship is one of strict law, and the surety's liability will not be extended by implication or interpretation.

Rawleigh Co. v. Overstreet, 71 Ga.App. 873, 32 S.E.2d 574 (1944); Palmes v. Southern Mechanical Co., 117 Ga.App. 672, 673, 161 S.E.2d 413 (1968); Peara v. Atlanta Newspapers, Inc., 120 Ga. App. 163, 169 S.E.2d 670 (1969). The surety not being bound beyond the strict construction of its contract, the bank

cannot recover the $30,000.00 loan to General or the lesser amount of the state judgment sued for in the counterclaim. *Cf.* Bank of Auburn v. United States Fidelity & Guaranty Co., 295 F.2d 641 (5th Cir. 1961); United States v. Maryland Casualty Company, 323 F.2d 473 (5th Cir. 1963).

In summary, Travelers is entitled to (1) the April 23, 1974 progress payment of $21,197.86, (2) the retained portion of the contract price less the sum of $3,613.18 for uncompleted work and (3) the proceeds of the sale of the attached equipment. The Authority may not recover liquidated damages nor is the bank entitled to repayment of the $30,000.00 loan or the state court judgment from the plaintiff.

To the extent that any findings of fact set forth above are deemed to be conclusions of law or to the extent that any of the foregoing conclusions of law are deemed to be findings of fact, the same shall be deemed conclusions of law or findings of fact, as the case may be.

The plaintiff is directed to submit to the court a proposed judgment in accordance with the terms of this order within ten (10) days.